The circuit judge entered a decree validating Auditorium and Dinner Key Facilities Revenue Bonds of the City of Miami in the sum of $2,200,000, and the state attorney appealed, charging that the issuance of the bonds would violate Section 6 of Article IX, of the Constitution, F.S.A., because the income from one installation to be constructed with the proceeds, a marina, was not pledged to pay the principal and interest of the obligations, and because the city would become obligated under certain conditions to replenish the revenue fund with money from the general fund or other funds of the city.
In 1946 the City of Miami bought the property known as Dinner Key, and part *Page 458 
of the purchase price was paid from the proceeds of $800,000 in revenue certificates which are still outstanding. On the land are situated some hangars and other buildings formerly used by the United States Navy. The net revenues of the facilities, including rentals determined by the city as "fair" and paid by it for the use of a part of the property for the housing of certain municipal departments, are presently deposited in a fund created for the retirement of the principal and interest of the unpaid certificates.
Because of its attractiveness to visitors and its development as a tourist center the continued success of the community depends on accommodations for individuals, groups, and assemblies of varying proportions. The growth of the city, too, has created a demand for added space to house municipal departments.
To cope with this situation the city commission determined that it was necessary to provide increased anchorage and dockage for water craft, additional facilities for the various city departments, an auditorium of sufficient size for the use of conventions and exhibitions, international and domestic.
It is proposed first to retire the outstanding certificates of $800,000 and expend the balance of $1,400,000 in remodeling and expanding one of the hangars, in enlarging the auditorium and recreation hall in Bay Front Park, widening the yacht basin, extending the public docks, and constructing a marina near Dinner Key. The income from all the property, except the marina, is pledged to the payment of the bonds, and it is anticipated that the net income from all the property, except the marina and the buildings occupied by city departments, will exceed the amount required to pay the interest and retire the bonds.
In the resolution setting out the transaction, the city agrees to rent the enlarged hangar, called the "Exposition Building," and the buildings to be used by the departments and to pay the current expenses of operation and maintenance of these from the operation of the Dinner Key facilities and the auditorium, but in the event the revenue shall be insufficient for these purposes or the city is in default under the trust agreement (to secure the payment of the bonds), such expenses shall be paid from the general funds of the city. It is this last provision, incidentally, which gives rise to the second question.
If we are to consider the bonds as being payable only out of a fund created from the income derived from the property on Dinner Key and the auditorium, I can see no objection in the provision that one unit, the marina, is excluded, especially as it appears there will be ample revenue from these sources. The purpose of the constitutional inhibition is to preclude the levy of taxes to meet obligations unless property owners are given an opportunity to voice their approval or disapproval beforehand. If the bondholder or the trustee cannot resort to coercive means to recover beyond the limits of the fund created solely from the income, then I find no objection to the scheme and do not comprehend how the constitutional guarantee would be affected simply because the income from a part of the improvement is not pledged. It seems to me that if the bondholder is aware of the constitutional limitations and the unavailability of any money save what is to be received from the property, exclusive of one installation, there is no need to be concerned with any impairment of the protection given the taxpayer.
The second question is much more difficult. It seems to me that if the city merely agrees to pay a fair rental for the property actually used by its departments, and this rental is the same as that which the city would have to pay private owners for the same housing and the necessity for renting property from private owners is real, there could be no objection to that rental being deposited in the fund as part of the income from the whole property, the net amount of which is pledged to discharge the interest and principal of the bonds
But the city undertakes to go farther than this. It agrees to pay as rental for the Exposition Building, Hangar F located on Dinner Key, the sum of $100,000 annually, and for the buildings to be used by the city *Page 459 
the annual rental of $40,000; then in the trust agreement it covenants that the "Current Expenses of the City rented buildings [the Exposition Building and the buildings to be occupied by the city departments] and the Auditorium * * * will not exceed the amount of the revenues derived therefrom and deposited to the credit of the Revenue Fund * * *." The current expenses of the "City rented buildings" are to be met by payments from the revenue funds unless they are insufficient or the city shall at the time be in default, "in which event such expenses shall bepaid from the general funds of the City or, if available, othermoneys of the City." (Italics supplied.)
So it appears that the marina is eliminated, to which, under certain circumstances, there would be no objection. Some of the buildings will be used by the city for its departments, and there, too, I would find no objection if it is necessary that the city rent property for the purpose and if the rental paid corresponds with that which would have to be paid by the city to private owners. I do find difficulty in approving the rest of the transaction because the city is obligating itself to pay $100,000 a year outright for the Exposition Building and then, by lumping this installation with the buildings to be occupied by the departments of the city, undertaking to guarantee that the expenses of maintaining them will not exceed the revenue and, if the revenue fund built up from the income, including the amount to be paid by the city, shall not be sufficient, to pledge moneys from the general fund and other moneys of the city.
I said at the outset that it was expected that the income from all the buildings, except the marina, would be sufficient to pay the interest on the bonds and eventually to retire them, but of course this estimate includes not only the rental for property needed by the city but the $100,000 rental which the city is paying for the use of the Exposition Building.
Although the installations described may be necessary to the economic welfare of a city like Miami, the trouble is that the whole plan is not so restricted that it is to be a self-sustaining unit to the end that those who purchase the bonds will look only to the net revenue for payment. As I understand the rather complex proposal, it is apprehended that the income may not be sufficient to pay the interest and retire the bonds, else there would be no occasion to provide that in a certain contingency the expenses should be paid from "the general funds * * * [and] other moneys of the City." If there is to be a liability for the expenditure of such funds in the event of default of the city in the covenants I have recited, there should be an election to approve the issuance of the bonds.
A history of the decisions of this court since the adoption of the constitutional amendment convinces this writer that the court has become progressively more liberal in approving issues of bonds payable from the revenue of property constructed with the proceeds of the bonds, since the early decision that such could be done to enlarge a then existing utility plant, but I cannot now go to the extent of agreeing to approve such an issue of bonds where the city is not only bolstering the revenue by promising to pay rental of $100,000 a year for a building not actually needed for it to function as a municipality and to be operated more in the nature of a business venture, but is also expressly covenanting that in the event of default, other funds of the city shall become available to pay the bonds. It is true that the covenant says that "expenses" shall be paid in that way, but that, of course, is only another way of providing that the funds shall actually be used to pay the bonds, for if the expenses are to be borne by the city, the revenue available to pay the debt is enhanced in a corresponding amount.
Whether this transaction may be so revised as to remove the objection I find I do not undertake to say, but I think the decree should not be affirmed unless there is eliminated the feature with reference to the use of any moneys other than those received from the properties contemplated in the transaction.
TERRELL, J., concurs. *Page 460